IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

KATHRYN JEAN JOHNSON,           )
                                )
            Plaintiff,          )
                                )
        v.                      )       Case No.
                                )       15-0637-CV-W-REL-SSA
CAROLYN W. COLVIN, Acting       )
Commissioner of Social Security, )
                                )
            Defendant.          )

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Kathryn Johnson seeks review of the final decision of the Commissioner

of Social Security denying plaintiff's application for disability benefits under Title II of the

Social Security Act ("the Act").  Plaintiff argues that the ALJ erred in giving controlling

weight to the opinion of a non-examining consultant and discrediting the opinion of

plaintiff's treating neurologist as well as plaintiff's testimony.  I find that the substantial

evidence in the record as a whole does not support the ALJ's finding that plaintiff is not

disabled.  Therefore, plaintiff's motion for summary judgment will be granted, the

decision of the Commissioner will be reversed, and this case will be remanded for an

award of benefits.

## I.      BACKGROUND

On April 9, 2012, plaintiff applied for disability benefits alleging that she had been

disabled since June 1, 2011.  Plaintiff's disability stems from Charcot-Marie-Tooth

disease.  Plaintiff's application was denied.  On November 5, 2013, a hearing was held

before an Administrative Law Judge.  On January 30, 2014, the ALJ found that plaintiff

was not under a "disability" as defined in the Act.  On June 25, 2015, the Appeals

Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the

courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

    Yes = not disabled.
    No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.    Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert Jenifer Teixeira, in addition to documentary evidence admitted at the hearing.

## A.    SUMMARY OF TESTIMONY

During the November 5, 2013, hearing, plaintiff testified; and Jenifer Teixeira, a vocational expert, testified at the request of the ALJ.

## 1.    Plaintiff's testimony.

Plaintiff is 5' 4" tall and weighs 145 pounds (Tr. at 33-34).  She was 58 years of age on her alleged onset date, was 61 at the time of the hearing, and is currently 63 (Tr. at 31).  She is married and has grown children (Tr. at 31).  She lives in a maintenance-provided town home (Tr. at 31-32).  Plaintiff has two years of college and

vocational training as a licensed practical nurse and completed an administrator-in-training program at the University of Missouri Columbia for nursing home administrators (Tr. at 32).

On her alleged onset date (June 1, 2011), plaintiff lost her job of 17 years (Tr. at 32). The business was a not-for-profit organization and was sold to a for-profit organization which brought in its own administrative staff (Tr. at 32). Plaintiff was a nursing home administrator (Tr. at 33). She supervised the staff, marketed the facility, made sure the facility was in compliance with state and federal regulations, and was in charge of the daily operations of the facility (Tr. at 33). In performing her duties as a nursing home administrator, plaintiff stood and walked quite a bit (about 2/3 of the day), but she did not do a lot of lifting (Tr. at 36).

Plaintiff did not try to find another nursing home administrator job after she lost this one because her condition has progressed, she has hand dexterity difficulty, she is unsteady on her feet, she falls, she has problems with balance and stability on the left side of her body, she was non-weight-bearing for five months with two surgeries and lost a lot of the muscle in her left calf and is no longer stable on that foot (Tr. at 36-37). Her employer had been accommodating her Charcot-Marie-Tooth disease ("CMT")[1]

_____

[1]"Charcot-Marie-Tooth disease is a group of inherited disorders that cause nerve damage. This damage is mostly in your arms and legs (peripheral nerves). Charcot-Marie-Tooth is also called hereditary motor and sensory neuropathy. Charcot-Marie-Tooth disease results in smaller, weaker muscles. You may also experience loss of sensation and muscle contractions, and difficulty walking. Foot deformities such as hammertoes and high arches are also common. Symptoms usually begin in your feet and legs, but they may eventually affect your hands and arms. . . . Signs and symptoms of Charcot-Marie-Tooth disease may include:
  • Weakness in your legs, ankles and feet

problems and her foot injury and surgeries (Tr. at 32, 37). After her surgery in October

2010, she was allowed to use a motorized wheelchair at work (Tr. at 37). She was

allowed to come in to work later in the day (10:00 or 10:30) to accommodate her fatigue

(Tr. at 37). She probably took more breaks than most employees (Tr. at 37-38).

Plaintiff's condition has progressed since she last worked (Tr. at 38). She has

difficulty opening things, and she drops things like keys or almost anything she picks up

because it is more difficult for her to use her fingers than it used to be (Tr. at 38-39). It

is much harder for her to fasten buttons, which has been present since she stopped

working and has gotten worse (Tr. at 39).

A month before the hearing was the last time plaintiff fell (Tr. at 39-40). Her

condition results in "foot drop" where her toes do not pick up right, she frequently

---

• Loss of muscle bulk in legs and feet
• High foot arches
• Curled toes (hammertoes)
• Decreased ability to run
• Difficulty lifting your foot at the ankle (footdrop)
• Awkward or higher than normal step (gait)
• Frequent tripping or falling
• Decreased sensation or a loss of feeling in your legs and feet
As Charcot-Marie-Tooth disease progresses, symptoms may spread from the feet and
legs to the hands and arms. . . . Charcot-Marie-Tooth disease is an inherited, genetic
condition. It occurs when there are mutations in the genes that affect the nerves in your
feet, legs, hands and arms. Sometimes, these mutations damage the nerves. Other
mutations damage the myelin sheath, the protective coating that surrounds the nerve.
Both cause weaker messages traveling between your extremities and brain. That
means some of the muscles in your feet may not receive your brain's signal to contract,
so you're more likely to trip and fall. And your brain may not receive pain messages
from your feet, so if you've rubbed a blister on your toe, for example, it may get infected
without your realizing it."
http://www.mayoclinic.org/diseases-conditions/charcot-marie-tooth-disease/home/ovc-2
0198772

catches her toe or her foot which leads to falling, and her ankles are weak (Tr. at 40). She sprained her right ankle during this most recent fall (Tr. at 40). She did not go to the hospital -- she put ice on it (Tr. at 40). Her ankle was blue, but she has dealt with this for a while so she knew what to do (Tr. at 40). Besides instability and falling, plaintiff suffers pain and swelling in her left foot with prolonged standing or walking (Tr. at 40). She can stand for 15 to 30 minutes before needing to sit down (Tr. at 41). If she had to stand longer than that, her foot would swell and she would need to elevate it (Tr. at 41). Plaintiff elevates her foot almost every night (Tr. at 41).

CMT also causes fatigue, which is a progressive symptom (Tr. at 41). Plaintiff is tired all the time, and she rests throughout the day to try to accommodate her fatigue (Tr. at 42).

Plaintiff takes Zyrtec (for allergies), Zetia (for high cholesterol), and Zoloft (for depression) (Tr. at 33). Her cholesterol medication aggravates her CMT a little bit (Tr. at 33). Plaintiff's CMT was progressing but she had no insurance (Tr. at 42). Her sister also has CMT and suggested plaintiff call the Muscular Dystrophy Association because CMT is a form of dystrophy (Tr. at 42). That organization put her in touch with Dr. Dick, a neurologist (Tr. at 42).

## 2. Vocational expert testimony.

Vocational expert Jenifer Teixeira testified at the request of the Administrative Law Judge. Plaintiff's past relevant work is nursing home administrator, DOT 187.117-

010, which is light and skilled with an SVP of 8[2] (Tr. at 44).

The first hypothetical involved a person who can sit for 6 hours per day; stand or walk in combination for 6 hours per day; lift, carry, push or pull 10 pounds frequently and 20 pounds occasionally; cannot push or pull with the lower extremities; can never climb ladders, ropes or scaffolding; can occasionally climb stairs or ramps, stoop, kneel, crouch, or crawl; should never engage in hard, repetitive grasping such as would be required to use pliers or open a sealed jar; and must avoid hazards such as dangerous machinery and unprotected heights (Tr. at 44). The vocational expert testified that such a person could perform plaintiff's past relevant work as a nursing home administrator as classified and as performed (Tr. at 44).

The second hypothetical involved the same nonexertional limitations as the first but the person could only perform sedentary work -- she could sit for 6 hours per day, stand or walk in combination for 2 hours per day, and lift negligible weights such as files and documents weighing up to 5 pounds frequently and up to 10 pounds occasionally (Tr. at 45). The vocational expert testified that such a person could not perform plaintiff's past relevant work (Tr. at 45).

The third hypothetical was the same as the first except the person could only occasionally use fine fingering and grasping (Tr. at 45-46). Such a person could not

---

[2]According to the Dictionary of Occupational Titles, SVP, or Specific Vocational Preparation, is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. An SVP of 8 means that it would take the average worker over 4 years up to and including 10 years to learn the job.

perform plaintiff's past relevant work, and there is no other work that the person could

perform (Tr. at 46).

**B.     ADMINISTRATIVE REPORTS**

The record contains the following administrative reports:

**Earnings Record**

Plaintiff earned the following income from 1967 through 2013, shown in both

actual and indexed figures:

| Year | Actual Earnings | Indexed Earnings |
|------|-----------------|------------------|
| 1967 | $ 231.00 | $ 1,803.87 |
| 1968 | 1,117.95 | 8,168.61 |
| 1969 | 0.00 | 0.00 |
| 1970 | 0.00 | 0.00 |
| 1971 | 2,713.38 | 17,002.42 |
| 1972 | 2,834.89 | 16,178.33 |
| 1973 | 3,289.71 | 17,668.41 |
| 1974 | 4,823.67 | 24,453.40 |
| 1975 | 1,235.63 | 5,828.40 |
| 1976 | 0.00 | 0.00 |
| 1977 | 1,104.37 | 4,597.47 |
| 1978 | 4,063.32 | 15,671.07 |
| 1979 | 8,439.37 | 29,930.01 |
| 1980 | 8,425.00 | 27,410.11 |
| 1981 | 9,715.20 | 28,716.95 |
| 1982 | 9,533.03 | 26,708.14 |
| 1983 | 9,522.03 | 26,708.14 |
| 1984 | 4,776.92 | 12,053.01 |
| 1985 | 15,064.40 | 36,456.87 |
| 1986 | 15,944.78 | 37,475.14 |
| 1987 | 16,496.53 | 36,447.50 |
| 1988 | 17,435.36 | 36,713.57 |

| | | |
|---|---|---|
| 1989 | 18,648.95 | 37,773.42 |
| 1990 | 21,900.26 | 42,400.40 |
| 1991 | 25,744.31 | 48,052.06 |
| 1992 | 30,748.66 | 54,580.53 |
| 1993 | 33,002.58 | 58,081.85 |
| 1994 | 31,375.84 | 53,775.63 |
| 1995 | 33,021.75 | 54,415.41 |
| 1996 | 34,914.72 | 54,852.20 |
| 1997 | 36,411.44 | 54,049.75 |
| 1998 | 40,662.45 | 57,357.98 |
| 1999 | 40,676.07 | 54,348.44 |
| 2000 | 45,563.44 | 57,688.43 |
| 2001 | 47,698.94 | 58,985.04 |
| 2002 | 50,152.26 | 61,403.04 |
| 2003 | 50,463.66 | 60,309.99 |
| 2004 | 47,392.05 | 54,123.01 |
| 2005 | 50,742.88 | 55,904.19 |
| 2006 | 53,645.28 | 56,504.68 |
| 2007 | 56,467.94 | 56,895.77 |
| 2008 | 59,276.93 | 59,276.93 |
| 2009 | 63,370.40 | 63,370.40 |
| 2010 | 62,254.85 | 62,254.85 |
| 2011 | 38,789.51 | 38,789.51 |
| 2012 | 0.00 | 0.00 |
| 2013 | 0.00 | 0.00 |

(Tr. at 138-139).

**Work History Report**

In an undated Work History Report plaintiff described her work as a nursing home administrator, which she performed from January 1995 through June 2011, as follows:  walking and standing 6 hours per day; sitting 2 hours per day; writing, typing or handling small objects 7 hours per day (Tr. at 165, 174).

**Function Report**

In a Function Report dated May 15, 2012, plaintiff described a typical day as letting her dogs out and getting them food and water, reading the newspaper while drinking coffee, checking and responding to email, performing light housework or laundry, taking a short afternoon trip to run errands, napping, watching the evening news, preparing the evening meal, watching television, performing light household chores again, and reading before bed (Tr. at 179). Plaintiff prepares simple meals daily, and it takes her 20 to 30 minutes to do this (Tr. at 181). She is able to do light household chores described as dusting, light cleaning, and some laundry with help from her husband (Tr. at 181). She is not able to do any of these activities for more than 20 to 30 minutes at a time (Tr. at 181). When she goes out, she drives or rides in a car (Tr. at 182). She is able to go out alone (Tr. at 182). She shops in stores, online and by phone (Tr. at 182). Her husband helps her with grocery shopping (Tr. at 182). Plaintiff uses a computer daily without difficulty for 20 to 30 minutes at a time (Tr. at 183, 188).

Plaintiff's impairment affects her ability to squat, stand for extended periods of time, walk distances, and climb stairs (Tr. at 184).

*C.* *SUMMARY OF RELEVANT MEDICAL RECORDS*

On July 1, 2010, plaintiff saw David Wilt, M.D., for a follow up on her hyperlipidemia (Tr. at 230-232). Plaintiff denied arthralgias (joint pain), myalgias

(muscle pain), motor or sensory deficits, paresthesias,[3] gait disturbance, anxiety, depression, and edema.  Her physical exam was normal.  She was assessed with chronic gastric reflux, high cholesterol, athlete's foot, and Charcot-Marie-Tooth disease.  "Problems are stable."  She was told to continue her medications and return in three months.

On August 18, 2010, plaintiff saw Susan Bonar, M.D., of Midwest Orthopedics Foot & Ankle, P.C. (Tr. at 264-265).  "The patient . . . describes slipping on ice in a parking lot in the winter of 2006 sustaining a left foot injury.  In 2008 she had what looks



on x-ray like a modified Kidner procedure [surgery to correct the arch of the foot]. . . . She now has a marked sag at the first metatarsal tarsal joint on standing lateral x-ray and sub-luxation[4] across the Lisfranc joint [shown on next page], with an increased flat foot clinically.  Her primary complaint is not pain but instability of the foot.  She says it's hard for her to walk because of foot collapses and turns in and she tires easily."  Dr. Bonar discussed surgery and a foot brace.

---

[3]An abnormal sensation, typically tingling or prickling ("pins and needles") caused chiefly by pressure on or damage to peripheral nerves.

[4]A slight misalignment



Second metatarsal
First metatarsal
Lisfranc joint
First, second and
third cuneiforms
Lisfranc joint complex
Cuboid

On October 7, 2010, plaintiff saw David Wilt, M.D., for a follow up (Tr. at 227-229). "Will be having surgery next week on her left foot, Lis Franc fracture." Plaintiff denied arthralgias, myalgias, motor or sensory deficits, paresthesias, gait disturbance,[5] anxiety, depression, and edema. Plaintiff's physical exam was normal. She was assessed with high cholesterol, Charcot's joint of the Lisfranc joint and Charcot-Marie-Tooth disease. "Problems are stable." She was told to continue her present medication and follow up in three months.

On November 3, 2010, plaintiff saw Susan Bonar, M.D., of Midwest Orthopedics Foot & Ankle, P.C., for a post-surgery follow up (Tr. at 266). Plaintiff's wound was healing well and the staples were removed. "She can go in a short-leg non-weight bearing cast with a toe plate." She was told to return in four weeks.

On December 1, 2010, plaintiff saw Susan Bonar, M.D., of Midwest Orthopedics Foot & Ankle, P.C., for a follow up (Tr. at 267). X-rays were taken. "The patient is doing very nicely with no pain. AP and lateral of the foot shows nice alignment. I recommend a high resolution CT scan one month from now to rule out nonunion."

---

[5]All of Dr. Wilt's records are identical with respect to range of symptoms and physical exam. Because plaintiff at the time had a broken foot and the record states that she denied any gait disturbance, I question whether these records are reliable since they seem to be, for the most part, merely copies of records from previous appointments.

On December 20, 2010, plaintiff had a CT scan of her left foot status post instrumentation and fusion of her left midfoot fracture (Tr. at 260). "No evidence for subluxation or dislocation is identified. There is nonunion of several fracture fragments of the plantar aspects of the medial and middle cuneiforms." (see diagram on page 13)

On December 29, 2010, plaintiff saw Susan Bonar, M.D., of Midwest Orthopedics Foot & Ankle, P.C., for a follow up (Tr. at 268). "I think it okay for her to weightbear fully in a walker/boot. I would like her to get a cushioned molded insert with a nice arch made." Plaintiff was told to return in four weeks.

On January 6, 2011, plaintiff saw David Wilt, M.D., for a follow up (Tr. at 224-226). "Charcot-Marie-Tooth, recent release of achillies of left foot, left foot surg[ery] and bone graft donation from left knee." Plaintiff denied arthralgias, myalgias, motor or sensory deficits paresthesias, gait disturbance (despite plaintiff currently being in a walker/boot and recovering from foot surgery), anxiety, depression, and edema. Her physical exam was normal. She was assessed with high cholesterol, Charcot's joint of the Lisfranc joint and Charcot-Marie Tooth disease. "Problems are stable." She was told to continue her present medications and follow up in three months.

On January 26, 2011, plaintiff saw Susan Bonar, M.D., with Midwest Orthopedics Foot & Ankle, P.C., for a follow up (Tr. at 269). "The patient notes she is doing well without any significant pain. AP and lateral of the left foot shows further healing. Possible lucency [bone lesion] at the first metatarsal tarsal fusion area, but she has no pain at all there. I will have her do activities as tolerated." Plaintiff was told to return in six to eight weeks.

14

On March 9, 2011, plaintiff saw Susan Bonar, M.D., of Midwest Orthopedics Foot Ankle, P.C., for a follow up (Tr. at 270). "The patient continues without any pain. AP and lateral of the left foot shows no change in alignment. I am still not sure that all of the joints fused completely, but she continues without any pain and her arch is good. I would always recommend that she wear arch supports that protect this area. We discussed the types of exercises to avoid."

On April 7, 2011, plaintiff saw David Wilt, M.D., for a follow up (Tr. at 221-223). Plaintiff denied arthralgias, myalgias, motor or sensory deficits, paresthesias, gait disturbance, anxiety, depression, and edema. Her physical exam was normal. She was assessed with chronic gastric reflux, high cholesterol, and Charcot-Marie-Tooth disease. "Problems are stable."

June 1, 2011, is plaintiff's alleged onset date.

On June 15, 2011, plaintiff saw David Wilt, M.D., for a follow up (Tr. at 218-220). Plaintiff denied motor or sensory deficits, paresthesias, gait disturbance, anxiety, depression, and edema. Plaintiff was assessed with chronic gastric reflux, high cholesterol, and Charcot-Marie-Tooth disease. "Problems are stable." She was told to continue her current medications and follow up in six months.

On June 15, 2012, plaintiff saw David Wilt, M.D., for a complete exam (Tr. at 273-277). "Will be going on a mission trip this summer to the jungle to work with children, needs malaria pills and ? need an antibiotic." Plaintiff denied prolonged fatigue, malaise, focal arthralgias, recent change in joint mobility or range of motion, focal joint instability, lower extremity or hand edema, depression, and anxiety. A

physical exam was performed. "Generally healthy-appearing, alert and cooperative." Plaintiff's physical and mental exams were normal. Plaintiff was assessed with chronic gastric reflux, high cholesterol, Charcots joint of the Lisfranc joint and Charcot-Marie-Tooth disease. "Problems are stable."

On March 14, 2013, plaintiff saw Arthur Dick, M.D., a neurologist (Tr. at 282). "In 2006 she sustained a fracture of the dorsum of the left foot (Lis-Franc). This was treated in about 2008 with tendon transfer and in 2010 with an arthrodesis.[6] She has practically had a collapse of the arch and after the arthrodesis was in a cast for about three months. Since then she has noticed significant atrophy below the knee on the left side. She has come close to falling, sometimes catching her toe, particularly on the left side." In a review of systems, plaintiff was positive for activity change, positive for gait problem, and positive for weakness. The second page of the record is partially cut off. A foot deformity is noted, as well as a "snapping" gait.

On April 3, 2013, plaintiff saw Richard Dubinsky, M.D., in the Department of Neurology at the University of Kansas Medical Center (the same office as Arthur Dick, M.D.) (Tr. at 283-285). "She has had multiple falls resulting [in] injuries and 2 surgeries on left ankle. Patient complains of weakness, tingling and numbness in her hands and feet." Dr. Dubinsky performed an exam and noticed atrophy of plaintiff's intrinsic hand muscles and her left calf muscle. Her finger, ankle,



_____

[6]Surgical immobilization of a joint by fusion of the adjacent bones.

and toe strength were diminished at 4/5.  She had

hammer toes bilaterally and inversion of her left foot.

She had decreased light touch and pinprick below

both ankles.  An electrodiagnostic study was

performed and was found to be abnormal and

consistent with Charcot-Marie-Tooth disease.



Hammer toe

On April 25, 2013, Arthur Dick, M.D., a neurologist, completed an impairment

questionnaire (Tr. at 286-292).

**Prognosis.**  CMT is progressive. The degeneration of motor nerves results in
muscle weakness & atrophy in the extremities, and the degeneration of sensory
nerves results in a reduced ability to feel heat, cold, pain.  CMT is not fatal,
normal life expectancy.

Dr. Dick noted that plaintiff's EMG from April 3, 2013, was abnormal and

consistent with CMT.  He was asked to list plaintiff's primary symptoms:

Distal weakness in the lower extremities.  Left foot deformity with an inward
collapse of the arch.  Difficulty with ambulation.  Significant atrophy below the
knee.  Frequent falls, weakness, tingling and numbness in hands and feet.

Plaintiff's fatigue was noted to be a 7/8 out of 10.  Dr. Dick found that plaintiff can

sit for 2 hours per day, meaning she would need to get up and move around "every 1-2

hrs."  She can stand or walk for up to 1 hour per 8-hour workday but not continuously.

She can lift up to 5 pounds occasionally, and she has limitations in repetitive reaching,

handling, fingering or lifting due to weakness, numbness and tingling in her hands.

Plaintiff's symptoms are "likely to increase if she were placed in a competitive work

environment."

On September 17, 2013, plaintiff was seen in the Muscular Dystrophy Clinic at the University of Kansas Medical Center (Tr. at 305-306). Plaintiff was noted to be "modified independent" with activities of daily living. She was able to use buttons and zippers and tie her shoes but increased time was required. Plaintiff was given left ankle dorsiflexion exercises. A left ankle foot orthotic and further occupational therapy were recommended.

On September 19, 2013, plaintiff saw Anita Hill, a medical assistant at the University of Kansas Medical Center (Tr. at 302). Plaintiff reported myalgias, weakness, and numbness. Plaintiff also met with Social Worker David Burkett (Tr. at 303). Plaintiff admitted to a history of falling but denied any problems with other activities of daily living. Plaintiff was able to drive. Also on this day, plaintiff saw Arthur Dick, M.D., a neurologist (Tr. at 303-305). "The patient has not fallen since her last visit but has come close on some occasions." Plaintiff reported problems with gait and weakness which had resulted in her changing her activities. On exam Dr. Dick observed atrophy of the intrinsic hand muscles (see diagram on page 16) bilaterally. Plaintiff's gait was described as "snapping." "Sensory examination reveals a moderate to severe impairment of position sense and vibratory sense perception bilaterally." Dr. Dick noted that plaintiff had seen the Muscular Dystrophy team and he agreed with those professionals that plaintiff should continue her current regimen.

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Christine Cooke entered her opinion on January 30, 2014 (Tr. at 13-19). Plaintiff's last insured date is December 31, 2016 (Tr. at 15).

Step one.  Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 15).

Step two.  Plaintiff has Charcot-Marie-Tooth disease, a severe impairment (Tr. at 15).  No other alleged impairments are severe including depression (Tr. at 15-16).

Step three.  Plaintiff's impairment does not meet or equal a listed impairment (Tr. at 16).  Although the ALJ stated in her opinion that plaintiff's attorney did not advance a listings argument, plaintiff's counsel did argue during the hearing that plaintiff's impairment meets or equals listing 11.14 (Tr. at 16, 34-35).

Step four.  Plaintiff retains the residual functional capacity to perform light work. She can lift and carry 10 pounds frequently and 20 pounds occasionally; she can never push or pull with her lower extremities; she can sit for 6 hours per day; she can stand and walk in combination for 6 hours per day; she can never climb ladders, ropes, or scaffolding; she can occasionally climb stairs or ramps, stoop, kneel, crouch and crawl. She should never engage in hard, repetitive grasping such as would be required to open a sealed jar or use pliers.  She should never be exposed to hazards such as dangerous machinery or unprotected heights (Tr. at 16).  With this residual functional capacity, plaintiff can return to her past relevant work as a nursing home administrator (Tr. at 18).

## VI.    CREDIBILITY OF PLAINTIFF AND TREATING NEUROLOGIST

Plaintiff argues that the ALJ erred in discrediting the opinion of Arthur Dick, M.D., plaintiff's treating neurologist, and in finding plaintiff's allegations not credible.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion including length of the treatment relationship and the frequency of examination; nature and extent of the treatment relationship; supportability, particularly by medical signs and laboratory findings; consistency with the record as a whole; and other factors, such as the amount of understanding of Social Security disability programs and their evidentiary requirements or the extent to which an acceptable medical source is familiar with the other information in the case record. 20 C.F.R. §§ 404.1527, 416.927.

Rather than giving controlling weight to the opinion of plaintiff's treating neurologist, Arthur Dick, M.D., the ALJ gave controlling weight to the opinion of a non-examining consultant who is not a neurologist.[7] However, such opinions are generally entitled to the least amount of weight. See 20 C.F.R. § 404.1527(c)(1)-(2); Coleman v. Astrue, 498 F.3d 767, 772 (8th Cir. 2007) (opinions from nonexamining sources "do not normally constitute substantial evidence"); Dixon v. Barnhart, 324 F.3d 997, 1002 (8th Cir. 2003) ("opinions of doctors who have not examined the claimant ordinarily do not

_____

[7]Denise Trowbridge, M.D., reviewed only some of plaintiff's medical records and found that plaintiff could stand and walk for six hours per workday, could frequently climb stairs and ramps, and could frequently balance (Tr. at 53).

constitute substantial evidence") (quoting <u>Nevland v. Apfel</u>, 204 F.3d 853, 858 (8th Cir. 2000)).

The records of plaintiff's treating neurologist (Dr. Dick) and her treating orthopedic surgeon (Dr. Bonar) are consistent, are supported by EMG testing, evidence of distal weakness in the lower extremities, left foot deformity in an inward collapse of the arch, difficulty with ambulation, significant atrophy below the knee, frequent falls, and weakness, tingling, and numbness of the hands and feet. In this case, the ALJ erred in giving controlling weight to the opinion of a non-examining consultant rather than to the opinion of plaintiff's treating neurologist.

Dr. Dick's opinion is also consistent with plaintiff's testimony which the ALJ largely discredited. The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. <u>Rautio v. Bowen</u>, 862 F.2d 176, 178 (8th Cir. 1988); <u>Benskin v. Bowen</u>, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. <u>Gray v. Apfel</u>, 192 F.3d 799, 803 (8th Cir. 1999); <u>McClees v. Shalala</u>, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. <u>Hall v. Chater</u>, 62 F.3d 220, 223 (8th Cir. 1995); <u>Robinson v. Sullivan</u>, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. <u>Robinson v. Sullivan</u>, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is not supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability include the following:

> . . . [A] fusion was performed in late 2010. Claimant tolerated the procedure well, and her condition began to improve. In early 2011, x-rays showed no changes in alignment and claimant complained of no pain. . . .

(Tr. at 16).

Although x-rays did indeed show no changes in alignment, in March 2011 Dr. Bonar noted that she was not sure all of the joints fused completely and x-rays showed

a bone lesion.  Additionally, the lack of pain does not detract from plaintiff's credibility as one of the symptoms of Charcot-Marie-Tooth disease is that "your brain may not receive pain messages from your feet, so if you've rubbed a blister on your toe, for example, it may get infected without your realizing it."  (see footnote 1 on page 5 and 6, citation from the Mayo Clinic; see also Dr. Bonar's August 18, 2010, medical record describing plaintiff's problem as instability and not pain).

> . . . Claimant . . . did eventually loss [sic] her job when another company bought her employer.  The undersigned asked claimant about this, and she testified that it was the takeover, not her condition, that caused her to leave her job.

(Tr. at 17).

Although plaintiff testified that she lost her job due to the takeover, she also testified that her employer made unusual accommodations for her medical impairments during at least the last year she worked there, including use of a motorized wheelchair, modified hours and an increased number of rest breaks.  Plaintiff testified that she did not look for another job in nursing home administration because without those accommodations she could not perform the job due to her medical impairment.

> In 2012 claimant reports that she continued to struggle with weakness in lower extremities related to CMT.  Claimant, however, sought little treatment, and it appears that the overall condition was stable.  Furthermore, claimant decided during this period that she would go overseas to perform missionary work with children.  In June 2012, David Wilt, M.D., examined claimant and reaffirmed her condition was stable.

(Tr. at 17).

The fact that plaintiff sought little treatment is not surprising since there is no cure for Charcot-Marie-Tooth disease and there are few treatment options.  Plaintiff's

medical records establish that she had multiple surgeries as a result of her impairment. She did not feel pain, so no pain medication was recommended. Her treating neurologist and treatment providers at the Muscular Dystrophy Association Clinic at KU Medical Center recommended an orthotic and occupational therapy.[8]

As plaintiff pointed out in her brief, the ALJ relied on plaintiff's mission trip to work with children. However, the ALJ did not elicit any testimony about what plaintiff did on that trip. Working with children could entail nothing more than rocking them in a

_____

[8]"There's no cure for Charcot-Marie-Tooth disease. . . . There are some treatments to help you manage Charcot-Marie-Tooth disease.
**Medications**
Charcot-Marie-Tooth disease may sometimes cause pain due to muscle cramps or nerve damage. If pain is an issue for you, prescription pain medication may help control your pain.
**Therapy**
 • Physical therapy. Physical therapy can help strengthen and stretch your muscles to prevent muscle tightening and loss. A program usually includes low-impact exercises and stretching techniques guided by a trained physical therapist and approved by your doctor. Started early and followed regularly, physical therapy can help prevent disability.
 • Occupational therapy. Weakness in the arms and hands can cause difficulty with gripping and finger movements, such as fastening buttons or writing. Occupational therapy can help through the use of assistive devices, such as special rubber grips on doorknobs or clothing with snaps instead of buttons.
 • Orthopedic devices. Many people with Charcot-Marie-Tooth disease require the help of certain orthopedic devices to maintain everyday mobility and to prevent injury. Leg and ankle braces or splints can provide stability during walking and climbing stairs. Consider boots or high-top shoes for additional ankle support. Custom-made shoes or shoe inserts may improve your gait. Consider thumb splints if you have hand weakness and difficulty with gripping and holding things.
**Surgery**
If foot deformities are severe, corrective foot surgery may help alleviate pain and improve your ability to walk. Surgery can't improve weakness or loss of sensation."
http://www.mayoclinic.org/diseases-conditions/charcot-marie-tooth-disease/diagnosis-treatment/treatment/txc-20198785

rocking chair.  This is not a proper factor to discredit plaintiff without any information at all about what plaintiff did and for how long.

Finally, Dr. Wilt did indeed find that plaintiff's condition was stable; however, he treated plaintiff for high cholesterol and chronic gastric reflux, and although he included Charcot-Marie-Tooth disease in plaintiff's records, he never actually provided any treatment for that condition.  Therefore, his records showing that plaintiff's condition was stable do not detract from plaintiff's credibility.

The ALJ pointed out that plaintiff is able to drive; however, the record establishes that plaintiff's surgeries were on her left foot.  It is certainly possible to drive despite difficulties with one's left foot; however, it is not possible to stand or walk for six hours per day (as the ALJ found) with the same left-foot difficulties.

The daily activities which the ALJ stated show that plaintiff is "relatively capable" do not involve an ability to stand or walk for significant periods of time.  The ALJ noted that in addition to driving, plaintiff is able to take care of the bills, spend time on the computer, and feed her dogs each day, none of which require significant standing or walking.

Plaintiff's work record is laudable.  She has worked for more than 40 years, with substantial earnings.  Her daily activities are minor and involve mostly sitting, she takes naps and rest breaks during the day, and many of plaintiff's daily activities do not involve the use of her left lower extremity.  Plaintiff's medical records support her allegations of falls resulting in injury and her testimony that fastening buttons and other fine motor activities require additional time to accomplish.  Plaintiff's treating neurologist

observed significant muscle atrophy in her arms and hands, her EMG was abnormal and consistent with Charcot-Marie-Tooth disease, and there is no record of noncompliance. The ALJ erred in finding plaintiff's subjective complaints not credible.

## VII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole does not support the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is granted. It is further

ORDERED that the decision of the Commissioner is reversed and this case is remanded for an award of benefits.

_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
June 14, 2016